IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

RICCARDO EXFORD,

      Plaintiff,

v.

CITY OF MONTGOMERY, OFFICER
J.A. NORGARD, and OFFICER R.S.
SHOUPE,

      Defendants.

Case No. 2:10-cv-1071-MEF
(WO—Publish)

## Memorandum Opinion & Order

### I. Introduction

This lawsuit arises out of a traffic stop that took place in 2010. During the stop, Officers Norgard ("Norgard") and Shoupe ("Shoupe")—the only two individual defendants in the case—pulled over the plaintiff, Ricky Exford ("Exford"), after he made a dangerous lane change. The stop initially went without incident: Shoupe wrote Exford a ticket and Exford got back in his truck and started to leave. Exford decided, however, to get back out so he could get the officers' names and badge numbers. Unfortunately, chaos ensued after Norgard took it upon himself to arrest Exford, take him to jail, and charge him with harassment and resisting arrest.

After the dust settled, a video of the incident emerged a few months later. Exford presented the recording to the municipal court where the charges were pending, and after

the presiding judge watched it he immediately dismissed the case. Then, armed with an acquittal and video evidence, Exford filed suit in federal court, alleging that the officers violated his rights and that the City of Montgomery should answer for the actions of its agents. Now, the defendants ask the Court to grant summary judgment on various grounds. For the reasons discussed below, the Court will GRANT Shoupe's motion while GRANTING IN PART and DENYING IN PART both Norgard and the City of Montgomery's motions.

## II. JURISDICTION & VENUE

The Court has jurisdiction over Exford's claims under 28 U.S.C. § 1331 (federal question), § 1343 (civil rights), and § 1367 (supplemental). The parties do not claim that the Court lacks personal jurisdiction over them, nor do they dispute that venue is proper under 28 U.S.C. § 1391(b). The Court finds adequate allegations supporting both contentions.

## III. SUMMARY JUDGMENT STANDARD

A motion for summary judgment looks to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A court should grant summary judgment when the pleadings and supporting materials show that no genuine issue exists as to any material fact and that the moving party deserves judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying" the relevant documents that

"it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To shoulder this burden, the moving party can present evidence to this effect. *Id.* at 322–23. Or it can show that the nonmoving party has failed to present evidence in support of some element of its case on which it ultimately bears the burden of proof. *Id.*

If the moving party meets its burden, the non-movant must then designate, by affidavits, depositions, admissions, and answers to interrogatories, specific facts showing the existence of a genuine issue for trial. *Jeffery v. Sarasota White Sox, Inc.*, 64 F.3d 590, 593–94 (11th Cir. 1995). A genuine issue of material fact exists when the nonmoving party produces evidence that would allow a reasonable fact-finder to return a verdict in his or her favor. *Waddell v. Valley Forge Dental Assocs.*, 276 F.3d 1275, 1279 (11th Cir. 2001). Thus, summary judgment requires the nonmoving party to "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586. A plaintiff, indeed, must present evidence demonstrating that he can establish the basic elements of his claim, *Celotex*, 477 U.S. at 322, because "conclusory allegations without specific supporting facts have no probative value" at the summary judgment stage. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985).

A court ruling on a motion for summary judgment must believe the non-movant's evidence. *Anderson*, 477 U.S. at 255. It also must draw all justifiable inferences from the evidence in the nonmoving party's favor. *Id.* After the nonmoving party has responded to the motion, the court must grant summary judgment if there exists no genuine issue of

material fact and the moving party deserves judgment as a matter of law. *See* Fed. R. Civ.

P. 56(c).

## IV. FACTUAL & PROCEDURAL BACKGROUND

**A.     The video on the dashboard camera**[1]

A video camera mounted on the dashboard of Norgard and Shoupe's patrol car

recorded the officers stopping Exford for a traffic violation. The video begins with the

officers' police cruiser driving down a two-lane road at dusk. As they approach an

intersection with a traffic light, a left-hand turn lane comes into sight and the cruiser

merges before stopping behind a small black car. Right in front of the black car is

Exford's crimson four-door pickup truck—it too stopped and waiting to turn left at the

intersection.

After only a brief pause, the cars in the front of the line start moving and the police

cruiser rolls toward the intersection. Once it gets there the driver turns left and swings

into the right-hand lane, quickly moving past the black car and pulling up behind

Exford's truck just close enough to read *Toyota* on the tailgate. A few seconds later, the

officer driving the cruiser flicks on the flashing red and blue emergency lights. Exford

responds by braking and activating his right turn signal. As he approaches another

intersection, he turns right, pulls into a small parking lot, and stops. The police cruiser

follows and stops just behind Exford's truck.

---

[1] Because both Exford and Norgard rely on evidence contradicted by portions of the videotape, the Court has decided to describe the video and decide the summary judgment motions using mainly this evidence. The credibility of the two men (or the lack thereof) is a jury question.

Officer Shoupe then exits from the passenger side and walks towards the truck; Officer Norgard does the same from the driver's side. Before reaching the truck, Shoupe cuts in front of Norgard and approaches the truck's driver's side. Norgard, meanwhile, passes behind Shoupe and moves towards the truck's passenger's side.

When Shoupe gets to the truck's window, he addresses Exford who quickly hands Shoupe a document. In the meantime, Norgard peers into the cab and shines his flashlight in the front passenger window and passenger compartment. As Shoupe hands back to Exford a piece of paper, Norgard moves towards the truck bed and flashes his light on Exford's license plate. The two officers then return to their respective seats in the police car—Norgard behind the wheel and Shoupe sitting shotgun.

About eight minutes later, Shoupe gets out and approaches the driver's side of Exford's truck while Norgard waits in the car. Shoupe and Exford then have an exchange for about two minutes, at which point Norgard gets out and joins them. After some more discussion between Shoupe and Exford, Shoupe hands Exford a citation. The officers then head back to the car and Exford puts his truck into gear.

Rather than driving away, Exford calls the officers back. This causes both officers to do an about face and begin to walk towards the truck. As they do, Norgard waives Shoupe off and approaches Exford alone. A few minutes later, Exford, while talking on his cell phone, gets out of his truck thus leaving the driver's side door open. He then walks by Norgard and past an amused looking Shoupe to the back of the police car. Norgard stays put near Exford's truck and uses his flashlight to look inside the cabin through the door left open by Exford.

Moments later Exford—who is still on the phone—walks back toward the truck and approaches Norgard. As he gets closer to the driver's side door, he seems to say something to Norgard and points inside the truck with his left hand. A split second later, Norgard grabs Exford's left hand and pushes him up against the back door of the truck on the driver's side. And once this happens, Shoupe immediately joins the fray. He grabs Exford's right elbow, takes Exford's cell phone from his hand and puts it on the roof of the truck, and tries to push Exford's hand to his waist and then behind his back. Exford responds by ever so briefly (yet quite noticeably) resisting Shoupe's attempt to restrain him. Shoupe in turn uses his right hand to shove Exford's head up against the back window on the truck's driver's side, holding it there while the two officers subdue him. Once they get Exford handcuffed, the officers place him in the back of the police cruiser.

## B.    After the arrest

After cuffing and securing Exford, the officers took him to the police station. When they arrived, Norgard filled out three documents—a deposition alleging harassment by Exford, a criminal complaint for harassment, and an arrest warrant for Exford for resisting arrest. (*See* ECF No. 58-7.) Norgard's sworn statement supporting the harassment claim stated:

> When Mr. Exford returned to his vehicle I was standing inside the open driver door and Mr. Exford extended his left arm forcefully placing his closed fist in my chest and (throwing me away from the truck) I grabbed Mr. Exford's left wrist and attempted to place him into custody. Mr. Exford resisted and continued to use his body to push me away from his vehicle. Mr. Exford also tried to pry his arm away from my grasp by bending

6

> and twisting his arm away from me toward the front of his body.
> At this time my partner (Shoupe) gained control of Mr. Exford's
> bent arm. Mr. Exford continued to struggle with officers by
> trying to keep his hands in front of his body and using his hips
> and legs to push both officers, but we were able to gain control
> of him and place him into custody.

(ECF No. 58-7.) Shoupe neither signed this statement nor submitted one of his own.

A few months after the incident, Exford appeared in municipal court to answer Norgard's charges of harassment and resisting arrest. These proceedings were short lived: the municipal court judge immediately dismissed the charges after watching the video of the traffic stop. (*See* ECF No. 58-7.) Things did not end here, however.

Sometime after the incident, the Mayor's office began investigating Norgard's arrest of Exford. And this resulted in Director Ronald Sams writing a memorandum on July 5, 2011, to Major R.E. Cook about what happened. Director Sams described the contents of the dashboard video as follows:

> The video does not appear to show Mr. Exford placing his left
> hand or elbow in Cpl. Norgard's chest and physically pushing
> Cpl. Norgard. The video does not appear to show Cpl. Norgard's
> body hitting the driver's door of Mr. Exford's vehicle. The video
> does not appear to show Mr. Exford in any physical altercation
> with Cpl. Norgard. The video does not appear to show Mr.
> Exford resisting by trying to pry his arms away by bending and
> twisting and placing them towards his body, and pushing
> himself against his truck. The video does not appear to show Mr.
> Exford being belligerent towards the officers.
>
> . . .

On Sunday April 11, 2010, Cpl. Norgard signed sworn affidavits
for harassment and Resisting Arrest against Mr. Ricardo [sic]
Rickey Exford. The affidavits state Mr. Exford placed his closed
fist in Cpl. Norgard's chest shoving Cpl. Norgard away. This is
in conflict with the circumstances shown in the dash cam video.
The dash cam video showed no evidence of Mr. Exford placing
his left hand, elbow or any body part on Cpl. Norgard's person.

(ECF No. 58-1.) Five days later, Norgard resigned "pending charges for Truthfulness At

All Times." (ECF No. 58-2.) [2]

## V. DISCUSSION

The City of Montgomery and Officers Shoupe and Norgard filed motions for

summary judgment on qualified immunity grounds on Exford's § 1983 claims. The

defendants moved for summary judgment on Exford's state law claims, too, arguing that

their motions should be granted for various reasons. The Court will first address the three

claims Exford effectively abandoned by failing to respond to the defendants' arguments.

After that, the Court will discuss whether the officers are entitled to qualified immunity

on Exford's federal claims. Finally, the Court will discuss Exford's state law claims.

## A.    Claims abandoned by Exford

Portions of Exford's Memorandum in Response to Defendants' Motions for

Summary Judgment (ECF No. 58) read like a complaint—and a poorly drafted one at

that. Each point heading for each claim contains boilerplate that reincorporates the facts

and allegations made earlier in the motion. This is wholly unnecessary given that

---

[2] Norgard has moved to strike both Director Sam's memorandum and the memorandum
memorializing his resignation. (*See* ECF No. 63.) Because the Court finds that a genuine issue of material
fact would exist even without these two pieces of evidence, it will deny Norgard's motion as moot.

Exford's brief (not to mention Shoupe's and Norgard's) contains a "Statement of Material Facts" section. After these redundant first paragraphs, Exford sometimes goes on to make substantive arguments defending his claims against summary judgment—the Court will address those below. Other times he doesn't, however, opting instead to ignore the defendants' arguments, recite the elements of the claim, and contend that he suffered damages. This is unacceptable at the summary judgment stage, the point in the proceedings where it is incumbent upon the parties to research and defend their respective legal positions or else face an adverse ruling. *See, e.g.*, Fed. R. Civ. P. 56(c); *Jones v. Hamic*, ___ F. Supp. 2d ___, No. 1:10-cv-202, 2012 WL 2872084, at *14 (M.D. Ala. July 13, 2012) (Fuller, J.) ("because Jones never addressed Odom's arguments in her summary judgment response, she has effectively abandoned her constitutional claims against Odom"); *Crayton v. Valued Servs. of Ala., L.L.C.*, 737 F. Supp. 2d 1320, 1330–31 (M.D. Ala. 2010) (citing *Wilkerson v. Grinnell Corp.*, 270 F.3d 1314, 1322 (11th Cir. 2001)); *Taylor v. City of New York*, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way."). The Court will therefore consider abandoned the following three claims that Exford has refused to defend.

The first is Exford's claim that the defendants conspired against him to violate his civil rights. The defendants moved for summary judgment on this allegation, arguing that the "intracorporate conspiracy doctrine" bars Exford from pressing the claim any further. *See Grider v. City of Auburn*, 618 F.3d 1240, 1261 (11th Cir. 2010) ("The intracorporate

conspiracy doctrine holds that acts of corporate agents are attributed to the corporation itself, thereby negating the multiplicity of actors necessary for the formation of a conspiracy." (quoting *McAndrews v. Lockheed Martin Corp.*, 206 F.3d 1031, 1036 (11th Cir. 2000) (en banc))). Because Exford failed to respond to the substance of this argument, he has effectively abandoned his conspiracy claim. Summary judgment is therefore due to be granted on it.

The same goes for his state law assault and battery and invasion of privacy allegations. The defendants moved for summary judgment on both claims, arguing that the Alabama Code allows officers to use force during arrests, *see* Ala. Code § 13A-3-27(a)(1), and that the officers never invaded Exford's privacy. Exford failed to respond to either argument in a manner that would allow anyone to think otherwise. Accordingly, the Court deems both claims abandoned, and summary judgment will be granted on both.

**B.     Qualified immunity**

The officers invoke the doctrine of qualified immunity to shield them from Exford's individual capacity claims. Qualified immunity protects government officials from the chilling effect that the fear of personal liability would create in carrying out their discretionary duties. *See Anderson v. Creighton*, 483 U.S. 635, 638 (1987). To this end, it immunizes "from suit all but the plainly incompetent or one who is knowingly violating the federal law." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (quoting *Willingham v. Loughnan*, 261 F.3d 1178, 1187 (11th Cir. 2001)).

Because qualified immunity acts as an affirmative defense, the "public official must first prove that he was acting within the scope of his discretionary authority when

the allegedly wrongful acts occurred." *Id.* "To determine whether an official was engaged in a discretionary function," federal courts look to see whether the challenged actions "fell within the employee's job responsibilities." *Crosby v. Monroe Cnty.*, 294 F.3d 1328, 1332 (11th Cir. 2004) (internal citation omitted). The inquiry does not ask "whether the act complained of was done for an improper purpose, but 'whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties.'" *Plotkin v. United States*, 465 F. App'x 828, 831–32 (11th Cir. 2012) (quoting *Harbert Int'l, Inc. v. James*, 157 F.3d 1271, 1282 (11th Cir. 1998)). The evidence here shows that both officers acted in their law enforcement capacities at the time of the incident with Exford. That is, they used the discretion vested in them as police officers to pull Exford over, speak with him, and eventually arrest him. The officers have thus carried their initial burden of showing they acted in a discretionary function.[3]

Once an officer seeking qualified immunity shows that he acted in a discretionary capacity, the burden shifts to the plaintiff to show that qualified immunity should not apply. *Lee*, 284 F.3d at 1194. Since Norgard and Shoupe met their burden, Exford must show that they violated one of his constitutional rights, and that the right was clearly established when the challenged conduct occurred. *Ashcroft v. al-Kidd*, 563 U.S. ___, ___, 131 S. Ct. 2074, 2080 (2011). In other words, Exford bears the burden of showing that, when the officers acted, "the law established the contours of a right so clearly that a

---

[3] The Court will discuss this issue again under state law because the federal and state standards diverge.

reasonable official would have understood his acts were unlawful." *Post v. City of Fort Lauderdale*, 7 F.3d 1552, 1557 (11th Cir. 1993). A plaintiff can meet this burden in the Eleventh Circuit by pointing to "decisions of the U.S. Supreme Court, the United States Court of Appeals for the Eleventh Circuit, and the highest court of the pertinent state." *Marsh v. Butler Cnty.*, 268 F.3d 1014, 1032 n.10 (11th Cir. 2001) (en banc). The Court will not, however, look to district court decisions or rulings from the other circuit courts of appeal, because "[e]ach jurisdiction has its own body of law, and splits between jurisdictions on matters of law are not uncommon." *Id.* Put simply, the Eleventh Circuit does "not expect public officials to sort out the law of every jurisdiction in the country." *Id.*; *but see Tekle ex rel. Tekle v. United States*, 457 F.3d 1088, 1096 (9th Cir. 2006) ("In the absence of binding precedent, we look to whatever decisional law is available to ascertain whether the law is clearly established for qualified immunity purposes, including decisions of state courts, other circuits, and district courts."); *Jacobs v. City of Chicago*, 215 F.3d 758, 767 (7th Cir. 2000) ("we broaden our survey to include all relevant caselaw in order to determine whether there was such a clear trend in the caselaw that we can say with fair assurance that the recognition of the right by a controlling precedent was merely a question of time."); *Cortez v. McCauley*, 478 F.3d 1108, 1114–15 (10th Cir. 2007) ("for a right to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains.").

### 1.    Qualified immunity on Exford's excessive force claim

As a general rule, an officer has the power to use a reasonable amount of force in making an arrest or investigatory stop. *Graham v. Connor*, 490 U.S. 386, 396 (citing *Terry v. Ohio*, 392 U.S. 1, 22–27 (1968)). When a plaintiff claims an officer used excessive force, courts deploy an objective test that gauges the reasonableness of the officer's actions given the totality of the circumstances. *Id.* Relevant factors include: "the severity of the crime, whether the suspect poses a threat to the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Saucier v. Katz*, 533 U.S. 194, 195 (2001) (citing *Graham*, 490 U.S. at 396). In addition, "the application of *de minimus* force, without more, will not support a claim for excessive force." *Nolin v. Isbell*, 207 F.3d 1253, 1257 (11th Cir. 2000).

In judging the reasonableness of an officer's actions, courts have to avoid any hindsight bias. And this is done by looking at the incident through the eyes of the officer on the scene at the time. *Garrett v. Athens–Clarke Cnty.*, 378 F.3d 1274, 1281 (11th Cir. 2004); *see also Graham*, 490 U.S. at 396 ("Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment."). Courts, in other words, refrain from second-guessing reasonable decisions made by police officers—even if the actions taken by the officer were not strictly necessary. *See Carr v. Tatangelo*, 388 F.3d 1259, 1270 (11th Cir. 2003). Thus it is important to distinguish between cases where officers use force against an already-restrained plaintiff and those where the officers use force while trying to arrest the plaintiff. The officers have much more leeway in the latter situation than they do in the former. *Compare Lee v.*

*Ferraro*, 284 F.3d 1188 (11th Cir. 2002) (allowing excessive force case past summary judgment where police officer slammed plaintiff's head into pavement after having him fully secured); *Slicker v. Jackson*, 215 F.3d 1225, 1233 (11th Cir. 2000) (allowing excessive force case past summary judgment where the officers "repeatedly hit [plaintiff's] head on the pavement, kicked him, and knocked him unconscious" after having already handcuffed him); *and Priester v. City of Riviera Beach*, 208 F.3d 919, 927 (11th Cir. 2000) (concluding force was excessive where police officer released attack dog on plaintiff while plaintiff was lying on the ground and the police officer's gun was pointed at plaintiff's head); *with Durruthy v. Pastor*, 351 F.3d 1080, 1094 (11th Cir. 2003) (granting qualified immunity and relying on how officers had yet to restrain plaintiff when they used force against him).

Here, the video of Exford's arrest shows that the officers acted reasonably by using only the force necessary to place Exford in handcuffs and secure him in the backseat of their police cruiser.[4] Norgard used only enough force to pull Exford's left

---

[4] Citing *Bashir v. Rockdale County*, 445 F.3d 1323, 1331–33 (11th Cir. 2006), Exford argues that, "It is well-established that if no probable cause authorizes an arrest, any use of force to effectuate the unlawful arrest is a violation of the Fourth Amendment" because it amounts to excessive force. (ECF No. 58 at 20–21.) But *Bashir* actually made plain that the *exact opposite* is true:

> The right to make an arrest "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." It follows, then, if an arresting officer does not have the right to make an arrest, he does not have the right to use any degree of force in making that arrest. This is the premise of Bashir's "excessive force" claim; but this is not what is meant by "excessive force." An excessive force claim evokes the Fourth Amendment's protection against the use of an unreasonable quantum of force (i.e., non-de minimis force unreasonably disproportionate to the need) in effecting an otherwise lawful arrest. When properly stated, an excessive

hand behind his back, which included pushing Exford up against the truck to gain leverage. Shoupe similarly used force only when he grabbed Exford's right hand and pulled it behind Exford's back and when he pushed Exford's head against the side of the truck with his outstretched right arm. Although Shoupe's decision to push Exford's head against the truck could raise some eyebrows, Shoupe did so only after Exford straightened his back and resisted Shoupe's attempt to help Norgard place Exford under arrest. Besides, Exford suffered no injuries, and neither officer's use of force rises above the trivial amount the Eleventh Circuit has time and again found insufficient to defeat qualified immunity. *See Durruthy*, 351 F.3d at 1094 ("Here, even if the force applied by Pastor in effecting the arrest—forcing Durruthy down to the ground and placing him in handcuffs—was unnecessary, plainly it was not unlawful."); *Crosby v. Monroe Cnty.*, 394 F.3d 1328, 1334–35 (11th Cir. 2004) (granting qualified immunity to officer who put his foot on the plaintiff's face after the plaintiff, while lying face down on the pavement, asked why he was being arrested); *Nolin*, 207 F.3d at 1258 n.4 (finding qualified immunity where officer grabbed plaintiff, shoved him a few feet against a car, pushed a knee against his back, and pushed his head into the van). Because the officers used a

---

force claim presents a discrete constitutional violation relating to the manner in which an arrest was carried out, and is independent of whether law enforcement had the power to arrest. A claim like Bashir's—that the deputies used excessive force in the arrest because they lacked the right to make the arrest—is not a discrete constitutional violation; it is dependent upon and inseparable from his unlawful arrest claim.

*Bashir*, 445 F.3d at 1332 (internal citations omitted).

reasonable amount of force, and since Exford suffered no physical injuries, the officers are entitled to qualified immunity on Exford's excessive force claim.

### 2.        Qualified immunity on Exford's unlawful arrest claim[5]

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The temporary detention of someone during a traffic stop amounts to a "seizure" of a "person" within the meaning of the Fourth Amendment; the seizure, therefore, must not be "unreasonable" under the circumstances. *See Delaware v. Prouse*, 440 U.S. 648, 653 (1979). Generally speaking, the decision to stop an automobile is reasonable if the officer has probable cause[6] to believe that a traffic violation has occurred. *See Whren v. United States*, 517 U.S. 806 (1996); *Pennsylvania v. Mimms*, 434 U.S. 106, 109 (1977) (per curiam).

But an arrest without probable cause violates the Fourth Amendment. *See Kingsland v. City of Miami*, 382 F.3d 1220, 1232 (11th Cir. 2004); *Marx v. Gumbinner*, 905 F.2d 1503 (11th Cir. 1990). Even so, an officer can avail himself of the qualified immunity doctrine if he had arguable probable cause for the arrest. *Kingsland*, 382 at 1232 (citing *Jones v. Cannon*, 174 F.3d 1271, 1283 (11th Cir. 1999)). This requires asking

_____

[5] Exford's scattershot complaint and response refers to an unlawful search and seizure but makes no mention of what the officers unlawfully searched or seized. The complaint later makes mention of a false arrest and false imprisonment and in doing so invokes the Fourth Amendment. To minimize the confusion created by Exford's haphazard pleadings, the Court has treated these counts as an unlawful arrest claim under the Fourth Amendment.

[6] "Probable cause is defined in terms of facts and circumstances sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense." *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975).

"whether 'reasonable officers in the same circumstances and possessing the same knowledge as the [d]efendants could have believed that probable cause existed . . . .'" *Id.* (quoting *Von Stein v. Brescher*, 904 F.2d 572, 579 (11th Cir. 1990)). For example, an officer that lacks probable cause as a result of a reasonable mistake can use the qualified immunity doctrine to inoculate himself against suit. *See, e.g.*, *Hunter v. Bryant*, 502 U.S. 224, 227 (1991); *Post v. City of Fort Lauderdale*, 7 F.3d 1552 (11th Cir. 1993).

Here, the officers pulled Exford over for a traffic violation, gave him a ticket, and tried to send him on his way. But after Shoupe handed him the ticket, Exford got out of his truck and tried to get the officers' names and badge numbers. This eventually ended in Norgard arresting him and later charging him with harassment and resisting arrest. Exford has produced no evidence that the officers violated his Fourth Amendment rights by stopping him initially, so the Court finds the officers had probable cause to pull him over for a traffic violation. The question, then, is whether Norgard had arguable probable cause to arrest Exford for harassment when he cuffed Exford outside of his truck.[7]

---

[7] Resisting arrest quite obviously could not serve as probable cause for initiating Exford's arrest—that would put the cart before the horse. Besides, "while an officer has the power to use a reasonable amount of force in making a lawful arrest or investigatory stop, an Alabamian has the reciprocal right to use force in resisting an unlawful arrest." *Galloway v. City of Abbeville*, ___ F. Supp. 2d ___, ___, No. 11-cv-663, 2012 WL 2527066, at *6 (M.D. Ala. July 2, 2012) (Fuller, J.) (citing *Sanders v. State*, 61 So. 336 (Ala. 1913) ("an attempt unlawfully to arrest gives the person sought to be arrested a right to resist")); *see also Telfare v. City of Huntsville*, 841 So. 2d 1222, 1229 (Ala. 2002) ("The law in Alabama is clear that, to a limited degree, a party is justified in attempting to resist an unlawful arrest. A party may use reasonable force to extricate himself from an unlawful arrest." (internal citations omitted)). And while the initial traffic stop would have sufficed for an arrest, Norgard's arrest documents make clear that he arrested Exford for resisting arrest and harassment, not for a traffic violation.

The arguable probable cause inquiry turns on the elements of the alleged offense and the facts of the case. *Skop v. City of Atlanta*, 485 F.3d 1130, 1137 (11th Cir. 2007). In *Turner v. Jones*, the Eleventh Circuit undertook this analysis after an officer, Jones, arrested the plaintiff, Turner, under Georgia's misdemeanor obstruction law. 415 F. App'x 196 (11th Cir. 2011).[8] Officer Jones made the arrest because Turner asked for the officer's name and leaned on his police car with pen and paper in hand to write it down. *Id.* at 199. The Georgia law at issue made it a crime to "knowingly and willfully" obstruct "any law enforcement officer in the lawful discharge of his official duties," and the district court held that Turner's actions gave the officer arguable probable cause to arrest him under the law. *Id.* at 199–200. The Eleventh Circuit disagreed and reversed, holding that a "reasonable police officer could not have interpreted Turner's leaning over the hood of the police car, in a position to write down Jones's name, as a knowing and willful act of hindrance or obstruction because Jones never told Turner that he was trying to leave or that Turner should stop leaning on the car." *Id.* at 200.

In this case, Norgard arrested Exford for harassment in Alabama. And under Alabama law, "[a] person commits the crime of harassment if, with intent to harass, annoy, or alarm another person, he or she either" makes physical contact with the other

---

[8] None of the defendants try to undermine *Turner* by arguing that an unpublished decision from the Eleventh Circuit fails to establish the relevant law clearly enough to defeat qualified immunity. Such an argument could conceivably be persuasive: unpublished decisions bind neither the court of appeals nor the district courts, so the uncertainty about the state of the law that surrounds an unpublished decision could mean that the law is insufficiently clearly established to put a reasonable officer on notice that his acts were unlawful. The Court, after looking into the matter only briefly, found no relevant decision answering this question one way or another. At any rate, because the defendants failed to raise the argument, they have waived it and the Court need not decide the issue.

person or directs abusive or obscene language his way. Ala. Code. § 13A-11-8(a)(1).

Harassment also includes "a threat, verbal or nonverbal, made with the intent to carry out

the threat, that would cause a reasonable person who is the target of the threat to fear for

his or her safety." *Id.* § 13A-11-8(a)(2). Norgard argues that the video "clearly shows"

that "Exford unnecessarily knocked into Norgard while reaching into his truck after not

stopping when initially directed to do so." (ECF No. 54 at 13.) And he contends that this

suffices for arguable probable cause for a harassment charge.

The Court would agree if the video actually shows what Norgard says it shows.

But after viewing the videotape closely multiple times, it does not appear that Exford

made contact with Norgard when he reached into his truck; if anything, it looks like

Norgard made contact with Exford first when he initiated the arrest. Indeed, an internal

investigation by the mayor's office reached the very same conclusion. (ECF No. 58-1.)

What's more, the video lacks sound, so the viewer has no way to know if Exford directed

any abusive or harassing comments towards the officers that could have given Norgard

arguable probable cause to arrest Exford. A reasonable juror, therefore, could find that

Exford never made physical contact with or directed abusive language toward Norgard

with the intent to harass him, and that Norgard, like the officer in *Turner*, lacked arguable

probable cause to make an arrest. Norgard's initial charge, moreover, stated that Exford

pushed him with his fist. While a reasonable juror could find that Norgard made an

innocent mistake when filling out the charging documents, one could also conclude that

Norgard initially lied to cover his tracks and changed his tune after Exford sued him.

Accordingly, Norgard's motion for summary judgment on Exford's unlawful arrest claim is due to be denied.

Exford also brought an unlawful arrest claim against Shoupe, alleging that Shoupe failed to prevent the violation of his rights. However, the only case Exford cites for the proposition that Exford's actions should be imputed to Shoupe deals with the use of excessive force, not a wrongful arrest. *See Fundiller v. City of Cooper City*, 777 F. 2d 1436, 1441–42 (11th Cir. 1985). So even if an officer could incur personal liability when his partner initiates an unlawful arrest, Exford has failed to point to a case from the Supreme Court of the United States, the United States Court of Appeals for the Eleventh Circuit, or the Alabama Supreme Court holding that this violates a constitutional right. Nor has he shown that Shoupe realistically could have intervened to stop the initial arrest by Norgard. *Cf. Riley v. Newton*, 94 F.3d 632, 635 (11th Cir. 1996) (relying on how defendant never saw his partner use excessive force and had no indication that he would to find defendant lacked reasonable opportunity to protect plaintiff); *O'Neill v. Kreminski*, 839 F.2d 9, 11–12 (2d Cir. 1988) ("The three blows were struck in such rapid succession that Conners had no realistic opportunity to attempt to prevent them. This was not an episode of sufficient duration to support a conclusion that an officer who stood by without trying to assist the victim became a tacit collaborator."). And in any event, Shoupe's uncontradicted affidavit states that he never saw the altercation, meaning that he had no basis to gauge whether Norgard lacked probable cause to arrest Exford to begin with. This alone entitles Shoupe to qualified immunity. As a result, his motion for summary judgment is due to be granted as it relates to Exford's unlawful arrest claim.

### 3.     Malicious prosecution

Section 1983 provides no substantive rights; it only serves as a vehicle "for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (plurality opinion). As a result, the statute technically does not provide a cause of action for malicious prosecution under federal law. Rather, the Fourth Amendment can, in some cases, provide a plaintiff with a claim analogous to one for malicious prosecution. Typically this happens "where the plaintiff, as part of the commencement of a criminal proceeding, has been unlawfully and forcibly restrained." *Whiting v. Taylor*, 85 F.3d 581, 584 (11th Cir. 1996). That is to say, "[w]hen a § 1983 plaintiff is unlawfully seized, and that seizure follows and derives from a criminal prosecution itself, the Fourth Amendment violation for which the plaintiff seeks redress 'is of the kind making a [§] 1983 claim based on the violation analogous to the tort of malicious prosecution.'" *Eloy v. Guillot*, 289 F. App'x 339, 345 (11th Cir. 2008) (quoting *Whiting*, 85 F.3d at 585–86).

To prevail on this type of claim, the plaintiff must prove (1) the elements of the common law tort of malicious prosecution, (2) an unlawful seizure in violation of the Fourth Amendment, and (3) that the unlawful seizure related to the prosecution. *Kingsland v. City of Miami*, 382 F.3d 1220, 1234–35 (11th Cir. 2004). For the unlawful seizure to relate to the prosecution, the deprivation of liberty suffered by the plaintiff must occur after his arraignment; "the plaintiff's arrest cannot serve as the predicate deprivation of liberty." *Id.* at 1235 (citing *Mejia v. City of New York*, 119 F. Supp. 2d 232, 254 (E.D.N.Y. 2000)). Here, Exford failed to argue that he was detained sometime after his arraignment while awaiting trial. So even assuming he could meet the first two

elements of a malicious prosecution-like Fourth Amendment claim, his failure to produce evidence on the third element dooms his chances for success. Summary judgment is therefore proper on this claim.

## C.    State law claims

Exford's complaint also contains state law claims against Norgard and Shoupe for malicious prosecution, false imprisonment, intentional infliction of emotional distress, and negligence. Furthermore, Exford alleges that the City of Montgomery should answer for the actions of the officers under the doctrine of vicarious liability. Below, the Court will apply Alabama law and discuss each contention in turn. It is worth noting, moreover, that a number of these claims mirror closely Exford's § 1983 claims. Yet while the state and federal claims are similar, the Constitution only establishes the *minimum* protections a State must provide its citizens. Put more simply, the Constitution creates a floor, not a ceiling, when it comes to protecting individual rights. This leaves the individual States free to provide *greater* protections than those provided by the Constitution. *See Brigham City v. Stuart*, 547 U.S. 398, 409 (Stevens, J., concurring) ("Federal interests are not offended when a single State elects to provide greater protection for its citizens than the Federal Constitution requires."). Thus, while some of a civil rights plaintiff's constitutional claims may fail, he can still succeed under state law—in some instances on almost identical claims—if Alabama provides greater protections than does federal law.

### 1.    State law malicious prosecution

Exford alleges that Norgard and Shoupe should face liability for malicious prosecution under state law. The basis for this claim is the officers' decision to initiate a

judicial proceeding against him by filing an allegedly false affidavit. (Am. Compl. ¶¶ 94–96.) Responding to this allegation, Norgard maintains that he had probable cause to arrest Exford and, besides, the district attorney made the ultimate decision to prosecute the case, which cuts off his liability for Exford's prosecution.

A malicious prosecution claim has five elements under Alabama law: (1) that the defendant instituted a judicial proceeding against the plaintiff, (2) without probable cause, (3) but with malice, (4) and although the prior proceeding ended in the plaintiff's favor, (5) he still suffered damages. *Delchamps, Inc. v. Bryant*, 738 So. 2d 824, 831–33 (Ala. 1999). The state circuit court dismissed the harassment and resisting arrest charges against Exford after viewing the videotape of the incident. So Exford satisfies the favorable termination requirement (the fourth element) of his malicious prosecution claim. A reasonable jury, moreover, could find that he suffered damages: he likely lost income while defending against the charges, he spent money paying a lawyer, and the ordeal presumably exacted an emotional toll on him. *See United States Fid. & Guar. Co. v. Miller*, 117 So. 668 (Ala. 1928) (allowing damages for mental anguish in malicious prosecution case).

As for the probable cause element, the Court has already held that a reasonable juror could conclude that Norgard lacked a sufficient basis to arrest Exford for harassment and resisting arrest. This creates a jury question on the second element that precludes summary judgment. And along these same lines, a jury can infer malice from the officer's lack of probable cause. *See, e.g.*, *Kitchens v. Wynn-Dixie, Inc.*, 456 So. 2d 45, 47 (Ala. 1984). In fact, the malice inference is particularly strong in civil rights cases

23

involving arrests followed by judicial proceedings, because Supreme Court precedent requires a plaintiff arrested and convicted of a crime to prove he had the conviction overturned before he can proceed against state actors under § 1983. *Heck v. Humphrey*, 512 U.S. 477 (1994). This requirement creates a perverse incentive for officers that violate a citizen's civil rights to press for a conviction, because the conviction itself will inoculate the officer against civil liability for his alleged wrongdoing. *See, e.g.*, *Barnes v. City of Dothan*, 842 F. Supp. 2d 1332, 1339 (M.D. Ala. 2012) (Fuller, J.) (granting motion to dismiss § 1983 claim based on allegedly false affidavit filed by arresting officer because plaintiff failed to have conviction reversed or otherwise vacated). Accordingly, the Court holds that, because a jury could find Norgard lacked probable causes, it could also find he acted with malice. This is especially true considering how Director Sams's memo states that Norgard lied in his affidavit. (ECF No. 58-1.)

The main point of contention on Exford's malicious prosecution claim, then, turns on the first element—whether the officers instituted a judicial proceeding against him. Norgard asserts that, because the district attorney decided to charge Exford, "there is no evidence [Norgard] ultimately made the decision to prosecute the case and therefore cannot be liable for a malicious prosecution claim." (ECF No. 54 at 30.) For support, he cites to *Eubanks v. Gerwen*, 40 F.3d 1157 (11th Cir. 1994).

Norgard's argument falls flat for two reasons. First, *Eubanks* is easily distinguishable. In that case, the defendant police officers informed the prosecution of all the evidence available to them, "including that which weighed for and against Eubanks' guilt." *Eubanks*, 40 F.3d at 1161. By disclosing all of the evidence to the prosecution, the

officers did not "act in such a way as improperly to influence the decision" to go forward with the charges; rather, they allowed the prosecutor to weigh the evidence independently and make the ultimate decision to prosecute free of undue influence. *Id.* By contrast, a reasonable juror could find that Norgard improperly influenced the prosecutor's decision by submitting a false affidavit in support of Exford's arrest. This fact alone brings this case outside the reach of *Eubanks*.[9] Second, Norgard's position—that a district attorney's decision to institute a criminal proceeding absolves a police officer of any responsibility for the charges—makes little sense in light of established precedent. Indeed, it is unclear how malicious prosecution claims could *ever* go forward if courts accepted this argument. Only a prosecutor can officially institute a criminal proceeding, so a police officer could *always* escape liability for this tort—even if he manipulates the prosecutor into bringing the charges against an innocent person. That Alabama courts ever allow malicious prosecution claims against police officers to go forward, *see, e.g.*, *Franklin v. City of Huntsville*, 670 So. 2d 848 (Ala. 1995) (denying motion to dismiss malicious prosecution claim against police officer), wholly undercuts Norgard's argument. With this in mind and for the reasons discussed above, summary judgment is due to be denied on Exford's state law malicious prosecution claim against Norgard.

---

[9] What's more, *Eubanks* dealt with a "malicious prosecution" claim under § 1983. As discussed above, the Eleventh Circuit has since made clear that it only recognizes a malicious prosecution-*like* claim for a Fourth Amendment violation, *see, e.g.*, *Whiting v. Taylor*, 85 F.3d 581, 584 (11th Cir. 1996), which requires a deprivation of liberty related to the prosecution in addition to the common law's requirements. This makes *Eubanks* further distinguishable.

Exford's claims against Shoupe, however, have gone as far as they can go. As the Court has already discussed, Shoupe's uncontradicted affidavit makes clear that he never saw Norgard initiate Exford's arrest. More importantly, Shoupe neither signed the documents Norgard used to support Exford's prosecution nor did he submit any of his own. This means Exford's claim against Shoupe fails as a matter of law: he has produced no evidence creating a genuine issue of material fact about whether Shoupe knew that Norgard lacked probable cause or that Shoupe himself acted with malice during Exford's arrest. Shoupe's motion for summary judgment is accordingly due to be granted.

### 2.    False imprisonment

Exford alleges that the officers committed the tort of false imprisonment when they arrested and held him in custody. (Am. Compl. ¶¶ 106–10.) The defendants disagree, however, arguing that Norgard had probable cause to arrest Exford and thus made a lawful arrest. In response, Exford simply reincorporates the arguments he made about the unlawfulness of his arrest under the Fourth Amendment. Because the Court has already held that no genuine issue of material fact exists about whether Shoupe lacked probable cause, his motion for summary judgment is due to be granted. This leaves only the false imprisonment claim against Norgard (and potentially the City if vicarious liability attaches).

"False imprisonment consists in the unlawful detention of the person of another for any length of time whereby he is deprived of his personal liberty." Ala. Code § 6-5-170. And this "includes directly restraining a person as well as threatening force to keep him in place or make him go where he does not wish to go." *Yabba v. Ala. Christian*

*Acad.*, 823 F. Supp. 2d 1247, 1251 (M.D. Ala. 2011) (Fuller, J.) (citing *Crown Central Petrol. Corp. v. Williams*, 679 So. 2d 651, 653 (1996)); *see also Big B., Inc. v. Cottingham*, 634 So. 2d 999, 1001 (Ala. 1993). Thus, a false or unlawful arrest—that is, an arrest without probable cause—will support a false imprisonment claim. *Upshaw v. McArdle*, 650 So. 2d 875 (Ala. 1994).[10] In discussing Exford's unlawful arrest claim under the Fourth Amendment, the Court found that there exists a genuine issue of material fact about whether Norgard had arguable probable cause to arrest Exford. It follows, then, that there also exists a trial worthy issue on Exford's false imprisonment claim against Norgard because the claim turns on whether Norgard had probable cause for the arrest. *See Walker v. Briley*, 140 F. Supp. 2d 1249, 1262 (N.D. Ala. 2001) ("Because the Court has already found there is evidence sufficient reasonably to suggest that no probable cause existed to arrest Walker without a warrant for disorderly conduct for purposes of his Fourth Amendment claim, such also implies that no probable cause existed for purposes of his state law claim for false imprisonment or arrest."). Consequently, summary judgment is due to be denied on Exford's false imprisonment claim against Norgard.

### 3.   Intentional infliction of emotional distress

Exford's amended complaint contains a claim for intentional infliction of emotional distress, a tort commonly referred to as outrage. (Am. Compl. ¶¶ 111–15.)

---

[10] Exford tries to press a claim for both false imprisonment and unlawful arrest. But under Alabama law, an unlawful arrest amounts to a type of false imprisonment, not a standalone tort. *See Crown Cent. Petrol. v. Williams*, 679 So. 2d 651, 654 (Ala. 1996). As a result, the Court has treated Exford's false imprisonment and unlawful arrest claims as a single false imprisonment claim.

According to Exford, the officers used excessive force in a manner "so outrageous in character and extreme in degree as to go beyond all possible bounds of decency and to be regarded as atrocious and utterly intolerable in a civilized community." (*Id.* at ¶ 112.) The defendants take issue with this characterization, of course, and argue that Alabama only allows outrage claims to go forward in certain limited circumstances.

Under Alabama law, a plaintiff pressing an outrage claim must prove three elements. The first is "that the defendants either intended to inflict emotional distress, or knew or should have known that emotional distress was likely to result from their conduct." *Callens v. Jefferson Cnty. Nursing Home*, 769 So. 2d 273, 281 (Ala. 2000). The second is "that the defendants' conduct was extreme and outrageous." *Id.* And the third is "that the defendants' conduct caused emotional distress so severe that no reasonable person could be expected to endure it." *Id.*

Because the concept of "emotional distress" has hazy boundaries (to say the least), Alabama courts limit the circumstances in which a plaintiff can recover damages on an outrage claim. The three categories of viable outrage claims in Alabama are (1) wrongful conduct in the context of family burials, *see Whitt v. Hulsey*, 519 So. 2d 901 (Ala. 1987) (holding jury question precluded summary judgment on outrage claim where defendant desecrated family burial ground of adjacent landowner); (2) insurance agents using heavy-handing tactics to force insureds to settle claims, *see Nat'l Sec. Fire & Cas. Co. v. Bowen*, 447 So. 2d 133 (Ala. 1983) (allowing outrage claim to go forward where insurance investigators threatened to kill plaintiff's two small sons, told plaintiff he would look good lying beside his dead brother, and drove plaintiff out into the woods at

gun point and threatened to kill him); and (3) egregious sexual harassment, *see Busby v. Truswal Sys. Corp.*, 551 So. 2d. 322 (Ala. 1989) (finding summary judgment improper where defendant made lewd sexual remarks to and gestures at female employees, touched the women inappropriately, and followed one of them home one night).

Here, Exford contends that Norgard's falsifying an affidavit gives rise to a viable claim for intentional infliction of emotional distress. Not only does this allegation fall outside the scope of his complaint,[11] it also falls outside of the three categories of behavior the Alabama Supreme Court uses to stake out the boundaries of an outrage claim. Because Exford fails to provide a persuasive reason why the Court should depart from the well-established categorical limitations discussed above, his intentional infliction of emotional distress claim fails as a matter of law.[12]

### 4.     Negligence

Exford's last claim against the officers seemingly sounds in negligence. He alleges that Shoupe and Norgard "carried out their duties . . . in a neglectful, unskillful, or careless manner." (Am. Compl. ¶ 121.) But he cites no authority supporting the viability of a standalone negligence claim against the officers. In fact, the only case he does cite,

---

[11] Exford's complaint bases his outrage claim on excessive force, not the filing of the false affidavit. He only mentions the false affidavit in his response to the defendants' motions for summary judgment.

[12] One could certainly argue, as Exford does, that a police officer lying to garner a conviction to cover up his wrongdoing should give rise to an outrage claim. While superficially persuasive, this argument has two fatal flaws. First, Alabama recognizes a malicious prosecution claim to guard against the type of police misconduct. This gives the victim of police conduct a remedy to right the specific wrong at issue here. Second, while the Alabama Supreme Court has the power to change the course of Alabama's common law, this Court does not. Instead, it must apply Alabama law as it stands today.

*Hawkins v. City of Greenville*, 101 F. Supp. 2d 1356 (M.D. Ala. 2000), involves

allegations of carelessness on the part of a *municipality*, not an individual law

enforcement officer. And the only attempt Exford makes at a substantive argument

amounts to nothing more than copying and pasting the vague allegations in his amended

complaint into the body of his response brief. (*Compare* Am. Compl. ¶¶ 122–23 *with*

Exford Resp. Br. 29.) This will not do. Summary judgment is therefore due to be granted

on his negligence-based claims.

### 5.    Municipal liability

Exford alleges that the officers, as agents of the City of Montgomery, triggered

liability on the part of the city because of the way they handled Exford's traffic stop.

Alabama has partially abrogated municipal immunity, so a municipality can in fact incur

liability for the negligent (but not the intentional) acts of its employees. *See* Ala. Code §

11-57-190 (1975). In other words, the common law rule of vicarious liability applies to

Alabama's municipalities. *See Ott v. City of Mobile*, 169 F. Supp. 2d 1301, 1314 (S.D.

Ala. 2001). This means that, "for the employer to be liable under th[e] doctrine, the

employee must first be liable for a tort," and "[i]f the agent is not liable for any tort, the

principal is also absolved." *Id.* (citing *Latham v. Redding*, 628 So. 2d 490, 495 (Ala.

1993)).

These rules sound easy enough to apply. But an Alabama law granting police

officers discretionary function immunity complicates matters: it makes state agents

immune from civil liability for conduct performed in "any discretionary function within

the line and scope of his or her law enforcement duties." Ala. Code § 6-5-338(a). As a

necessary corollary, the immunity granted to the state agent extends to his principal, the municipality.[13] *Id.* § 6-5-338(b); *Howard v. City of Atmore*, 887 So. 2d 201, 211 (Ala. 2003) ("§ 6-5-338 shields the City from liability for the alleged 'neglect, carelessness and unskillfulness'" of its officer). So Exford's attempt to hold the City of Montgomery liable turns on a single question: was Norgard exercising a discretionary function when he arrested Exford?

"Generally, arrests and attempted arrests are classified as discretionary functions." *Telfare v. City of Huntsville*, 841 So. 2d 1222, 1228 (Ala. 2002). Yet Alabama law divests law enforcement officers of discretion to make an arrest without a warrant except in two circumstance. The first is where the officer has probable cause to believe the arrestee committed a felony. Ala. R. Crim. P. 4.1(a)(1)(i). The second is where the officer has probable cause to believe the arrestee committed any other offense in the officer's presence. Ala. R. Crim. P. 4.1(a)(1)(ii).

In *Telfare*, the police officer, McCarver, had probable cause to believe that the arrestee, Telfare, had committed various misdemeanors when he arrested him. But since the crimes did not take place in McCarver's presence, he lacked the discretion necessary to arrest Telfare lawfully. Consequently, the Alabama Supreme Court held that McCarver had no right to invoke qualified immunity from Telfare's civil suit for an unlawful arrest under state law. *Telfare*, 841 So. 2d at 1228. And because McCarver could not invoke

---

[13] Of course, immunity does not apply "when the State agent acts willfully, maliciously, fraudulently, in bad faith, beyond his or her authority, or under a mistaken interpretation of the law." *Ex parte Cranman*, 793 So. 2d 392, 405 (Ala. 2000).

qualified immunity, neither could his municipal employer, the City of Huntsville. *Id.* at 1229.

In this case, a reasonable juror could conclude that Norgard lacked probable cause to arrest Exford. Although Norgard testified that Exford made contact with him and that this gave him probable cause to make the arrest, the dashboard video directly contradicts his story. So much like the situation in *Telfare*, there exists a genuine question about whether Norgard had authority under Alabama law to arrest Exford. By the same token, because the municipality's liability for Norgard's actions depends on how the jury resolves this question, there also exists a trial worthy issue on the municipality's liability. For this reason, the City of Montgomery's motion for summary judgment is due to be denied as it relates to Exford's attempt to hold the city responsible for the officer's actions. The motion is due to be granted, however, to the extent Exford attempts to hold the City liable for negligent training and supervision of Norgard because Exford has produced no evidence about how the City trains and supervises its officers.

## VI. CONCLUSION

The Court has fully considered the parties' briefs, the arguments made for and against granting summary judgment, and the relevant evidence. With this in mind, it is hereby ORDERED as follows:

1.   Shoupe's Motion for Summary Judgment (ECF No. 51) is GRANTED.

2.   The City of Montgomery's Motion for Summary Judgment (ECF No. 51) is GRANTED IN PART and DENIED IN PART. It is granted on every claim except Exford's state law

malicious prosecution claim and his state law wrongful arrest claim.

3.     Norgard's Motion for Summary Judgment (ECF No. 53) is GRANTED IN PART and DENIED IN PART. It is granted on every claim except Exford's Fourth Amendment wrongful arrest claim, his state law malicious prosecution claim, and his state law wrongful arrest claim.

4.     Norgard's Motion to Strike (ECF No. 63) is DENIED AS MOOT.

Done this the 24th day of August, 2012.

                                          /s Mark E. Fuller
                         _____
                              UNITED STATES DISTRICT JUDGE